# EXHIBIT A

## Pennsylvania Special Education Hearing Officer

### Final Decision and Order
### CLOSED HEARING

ODR File Number: 30546-24-25 KE

A.M.                              **Date of Birth: 7/1/2013**
                                  **Parent**

K.B.
███████████
Philadelphia, PA 19143

**Counsel for Parent**

Scott Wolpert, Esq.
 400 Maryland D
Fort Washington, PA 19034

**Local Education Agency**

**Laboratory Charter School**
 Hillary El
  926 W Sedgley Avenue,
Philadelphia, PA 19140

**Counsel for the LEA**

 Alan Epstein, Esq.
  Spector Gadon Rosen Vinci P.C.,
1635 Market Street - 7th Floor,
Philadelphia, PA 19103

**Decision Date:** April 30, 2025    **Hearing Officer** Charles W. Jelley Esq.

## Background

The Parent filed the pending Due Process Hearing Complaint alleging multiple violations under the Individuals with Disabilities Education Act (IDEA) and Section 504. First, the Parent requests that the Hearing Officer order Lab Charter to fund the costs of a comprehensive independent psychoeducational evaluation, a comprehensive independent speech and language evaluation, a comprehensive independent occupational therapy evaluation, and a functional behavior assessment. Second, the Parent requests that the Hearing Officer order Lab Charter to convene the IEP team and issue an IEP that offers appropriate programming and placement for the Student, including placement at an Approved Private School or private school. Third, they seek compensatory education. Lab Charter, on the other hand, seeks a declaration that at all times relevant, it complied with the ADA and Section 504.

After a careful review of both the intrinsic and extrinsic evidence, I conclude that the Lab Charter failed to offer and provide a FAPE for each school year at issue. To the extent the Parent's 504 FAPE claims overlap and are inextricably intertwined with the IDEA FAPE claims, the following decision and grant of appropriate relief resolves all FAPE-based claims in the Parent's favor.[1]

---

[1] The following Findings of Fact were made as necessary to resolve the issues; thus, not all of the testimony and exhibits were explicitly cited or given equal weight. However, in reviewing the record, while the testimony of all witnesses and the content of each admitted exhibit were thoroughly considered, as were the parties' closing statements not all testimony or exhibits were given proper weight. In the interest of confidentiality and privacy, Student's name, gender, and other potentially identifiable information are not used in the body of this decision. All personally identifiable information, including details appearing on the cover page of this decision, will be redacted prior to its posting on the website of the Office for Dispute Resolution in compliance with its obligation to make special education hearing officer decisions available to the public pursuant to 20 USC § 1415(h) (4) (A); 34 CFR § 300.513(d)(2; 34 CFR § 104.1- 104.36) and 22 Pa Code § 711. *et. seq*. References to

## Statement of the Issues

    a) Whether the Lab Charter schools IEPs, as offered and implemented, failed to provide the Student a FAPE in the least restrictive environment during the 2022-2023 and 2023-2024, 2024-2025 school year, under both the IDEA and Section 504? If not, what relief is appropriate?

    b) Did the Lab Charter fail to evaluate the Student in all areas of suspected disability properly? If the answer is yes, what relief, if any, is appropriate?

## Background

1. The Student is an 11-year-old, 5th-grade student who has been enrolled in Laboratory Charter School ("Lab Charter") since the end of the 1st grade school year (2019-20). (NT pg. 49, lines 10-13).

2. Upon enrolling in Lab Charter for the 1st grade school year (2019-20), the Student attended school virtually due to COVID-19 restrictions. In 2nd grade school year (2020-21), Lab Charter continued to provide virtual programming to its students. (P-3).

3. The Student has a medical diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD") and Autism Spectrum Disorder ("Autism"). The Student is currently eligible for special education services under the primary disability category of Other Health Impairment ("OHI") (due to an ADHD diagnosis) and the secondary disability category of Speech or Language Impairment. (S-23, pg. 21).

4. The Student demonstrates deficits in functional communication, reading, math, written expression, social reciprocity, emotional regulation, executive functioning, language skills, and behavioral dysregulation. (P-3, P-12, P-14, and S-23).

## The 2020-2021 School Year

5. Early in the 2020-21 school year, the Parent became concerned about students' academic skills, comprehension, social skills, attention, and emotional and behavioral regulation deficits. In October 2020, the Student's Mother requested a comprehensive

---

the record throughout this decision will be to the Notes of Testimony (N.T)., School District /LEA Exhibits (S-) followed by the exhibit number, and Parent Exhibits (P-) followed by the exhibit number.

evaluation of the Student to determine eligibility for special education services. (P-2; NT pg. 52, lines 17-25).

6. On December 22, 2020, Lab Charter completed the requested evaluation and issued its initial Evaluation Report. (P-3).

7. As part of this initial evaluation, Lab Charter's evaluator administered the Wechsler Intelligence Scales for Children, 5th Edition (WISC-V). The Student's scores ranged from a standard score of 92 on the Verbal Comprehension Index to a standard score of 45 on the Processing Speed Index. The Lab Charter's evaluator agreed during testimony that the Processing Speed scores may have been inaccurate as the Student continually expressed a desire to leave during testing. Despite the 47-point discrepancy in scores and the potential inaccuracy of the Processing Speed Index acknowledged by the evaluator, Lab Charter's evaluator still improperly reported and relied upon the Student's Full-Scale IQ ("FSIQ"). (P-3, pg. 6-9).

8. Lab Charter did not administer other measures to determine the Student's actual processing speed and did not calculate an alternative index that would have explained the Processing Speed subtest scores on the Student's General Ability Index ("GAI") to determine actual cognitive functioning or potential. (NT pg. 659, lines 13-22). Lab Charter did not assess the Student's language skills or sensory processing skills. (NT *passim*)

9. According to the results of the Wechsler Individual Achievement Test, Third Edition (WIAT-III), the Student's scores in Overall Math, Math Fluency, Computation, and Problem-Solving were all in the Low range. The scores in Early Reading, Word Reading, and Sentence Repetition were all in the Below Average Range. This scoring profile indicates that the Student lacked the necessary fundamental academic skills. The Student's low academic level is corroborated by the Student's Exact Path Kindergarten level in math, Reading, and English and Language Arts (ELA) – placing the Student two years behind their peers. (P-3, pgs. 4-5, 9-11).

10. The Parent and the Student's teacher completed Behavior Assessment Scales for Children, Third Edition (BASC-3) and the Conners, Third Edition (Conners-3) rating scales. Both raters endorsed that the Student had difficulty adapting to change, took longer to recover, and demonstrated significant attention problems. (P-3, pgs. 12-18).

11. The Student's Conners-3 ratings in the areas of Peer Relations, Executive Functioning, and Learning Problems were in the Very Elevated range. Ratings measuring inattention fell in the Very Elevated range from the Student's teacher and the Elevated range from his Mother. Lab Charter's evaluator determined that the

Student's teacher and Mother were in strong agreement with the characteristics of ADHD - Inattentive Type. (P-3, pgs. 17-18).

12. On February 3, 2021, Lab Charter issued an initial IEP for the Student. The February 3, 2021 IEP. (P-4). The IEP included four goal statements that incorporated various distinct skills into one action. For example, one IEP goal required the Student to ask for help and complete an assignment. The criterion for success measured the skill set in one overall accuracy score. As written, it was unclear whether the accuracy reported was intended to be how well the Student completed the assignment, how often the Student asked for assistance, or the number of times the Student handed in work. (P-4, pgs. 31-35).

13. The sight word goal incorporated kindergarten and 1st-grade sight words, which included two-word lists of 52 and 41 sight words. The goal developed by Lab Charter required to learn a total of 20 of 40 words selected by Lab Charter, and it targeted an increase of only 17 sight words over the IEP term. The criterion for success, if mastered, would not have represented meaningful progress for the Student. (P-4, pg. 33). The February 3, 2021, IEP Lab Charter included a brief list of generic forms of specially designed instruction (SDI); other SDIs state general, not individualized, instructional modifications (i.e., guided practice, verbal cues). Lab Charter offered 20 minutes of group counseling each week; however, the IEP does not indicate a basis for this service or a description of what would be accomplished during those sessions. Lab Charter proposed, and the Parent agreed to curb-to-curb transportation. (P-4, pg. 36).

14. The February 3, 2021, IEP and corresponding NOREP stated that the Student would receive Supplemental Emotional Support and Learning Support, spending 78% of the day in the general education setting. The IEP does not describe who, how, or what programming the Student would receive while outside the general education classroom or what needs it would address. At another point, the February 3, 2021, IEP states that the Student spent the full day with general education peers using the general education curriculum. The regular education is roughly 1-2 years above the identified ballpark instructional levels at that time. (P-4, pp. 39-41). Although the Student has demonstrated deficits in numerous behavioral and emotional self-regulation and executive functioning skills, none of these deficits were included as SDIs or goal statements in the February 3, 2021, IEP. (P-3; P-4).

15. Lab Charter's IEPs, dated February 3, 2021, did not identify executive functioning, social communication, or written expression

as educational needs. (P-4, pg. 23; NT pgs. 284 lines 4 – 285, line 3; P-9; P-10).

16.  Lab Charter consolidated multiple individual skill statements into a single goal/data point in math. For example, the goal statement called for the Student to learn addition and subtraction of single - and double-digit numbers as one goal. (P-4, pg. 34).

17.  According to the Student's 2021-22 Lab Charter's service log, the student Lab Charter provided push-in support and was only provided pull-out instruction a total of 10 times during the months of October and November. Although required, the Student did not receive the counseling sessions listed in the Student's IEP. (P-7).

18.  The Math progress reports described almost identical math skills statements in both the November 2021 and the January 2022 progress reports. (P-4, pg. 34).

19.  Although the Lab Charter described the Student as an "above average reader," the objective assessment data available to the team indicated that the Student was performing below grade level in reading. (P-4, pg. 33).

20.  On November 16, 2021, and on January 25, 2022, Lab Charter issued progress reports that provided purely anecdotal statements. The reports did not provide the Parent and the IEP team with adequate information to determine whether the Student was learning or making any progress. (P-4, pgs. 31-35). The November 2021 progress report on the reading comprehension goal stated that the Student could read "most" of a 0.8 level story and answer questions "after a few reads," which indicates that Student has kindergarten-level reading skills. (P-4, pg. 35). The IEP reports that the Student had a 1.2 grade level equivalent in math computation and word reading. Next, the IEP states that the Student was performing at the 1.0 grade level equivalent in spelling and the <1.0 grade level equivalent in sentence comprehension. The Student's teacher continued to report that the Student was well-behaved but lacked focus. (P-9, pgs. 6-7).

The IEP provided that the Student should receive Supplemental Emotional Support and Learning Support, spending 78% of the day in the general education setting. (P-10; P-12).

21.  At the conclusion of the Second grade school year – 2020-2021, the Mother asked, and the school agreed to allow the Student to repeat second grade. The Student repeated the grade and the IEP supports were not provided with fidelity. (P-4 pp.30-36; P-9 pp.6-7; *Compare* P-4, pgs. 31-35 *with* P-9, pp.15-20).

## 3rd Grade School Year (2022-23)

22. For the 2022-2023, the 3rd grade school year, the Student continued to spend the entire school day in the general education setting (NT pgs. 80-82; p.120).

23. On February 1, 2022, Lab Charter convened an IEP meeting and issued a new annual IEP for the Student. The February 1, 2022 IEP was substantially similar to the February 3, 2021 IEP. Like the February 1, 2022, IEP did not address the reasons for the previous retention or explain how the proposed programming would increase the Student's present levels. (P-9).

24. The February 1, 2022, IEP sight word goal statement was expanded to include monitoring or reading and writing at "instructional level." The goal statement continued to use the Student's spelling test grades as a measure of success. (Compare P-9, p. 15 with P-4, p. 33). Although needed, the Student IEP did not include a goal statement for decoding, encoding, and sight words. (P-3, pgs. 4-5, 9-11).

25. Although the February 1, 2022, IEP stated that the Student should continue to receive Supplemental Emotional Support and Learning Support, meaning upward of 22 % of the time receiving specially designed instruction, the Student Lab Charter placed in the general education class for more than 78% the school day in general education. The February 1, 2022, IEP continued to describe the Student's placement as participating fully with students in the general education classroom using the regular education curriculum (P-9, pgs. 24-26).

26. On November 16, 2022, Lab Charter issued progress monitoring reports on the IEP goals from the Student's February 1, 2022 IEP. The reports do not evidence gains or meaningful improvements. (P-9, pgs. 15-20). The word goal continued to describe sounding out words on spelling tests. (P-9, pg. 15). Lab Charter next reported that the Student was able to add and subtract single- and double-digit numbers with and without regrouping with 90% accuracy without the use of manipulatives. If accurate, this report should have prompted Lab Charter to revise the Student's annual math goal to enable him to make meaningful progress toward grade-level math standards. The IEP was not updated. (P-9, pg. 17).

27. On October 4, 2022, Lab Charter issued a stand-alone NOREP that specified the Student's transportation would be curb-to-curb in an individual taxi. The revised transportation system did not address the ongoing transportation challenges that caused late arrivals at school and home (P-8; NT pgs. 87-90).

28.  Lab Charter reported anecdotally in March 2023 and in June 2023 that the Student could generally perform addition and subtraction but often mixed up regrouping when the addition and subtraction problems were together. The Lab Charter March 2023 report, in particular, indicates limited progress and states that the Student was right "50% of the time. Comparing the 2023 reports to the November 2022 report, it appears that the Student's math skills declined during the 2022-23 school year. (P-9, pg. 20).

## 4th Grade School Year (2023-24)

29.  During the Student's 4th grade school year (2023-24), the Student was again placed in the general education classroom with the expectation of some type of pull-out Learning Support and counseling sessions. The overall record indicates that Lab Charter failed to consistently provide either the Learning Support services or the counseling sessions throughout the 4th grade year (NT pgs. 80-82; 273-276). During the Student's 4th grade school year, the transportation problems persisted, which in turn led to the Student routinely arriving late for school (NT pgs. 87-90).

30.  On August 15, 2023, Parent sent a written request, through counsel, for the Student's educational records pursuant to the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g and as permitted under the IDEA and its corresponding regulations, 34 C.F.R. § 300. Lab Charter failed to respond to this request in a timely manner. Several follow-up inquiries were made, and the educational records were not produced for inspection in a timely manner. (P-17 to P-21).

31.  When asked by the Parent's counsel, "Ms. [redacted], [the Special Education Director] hasn't the Charter School already had its chance to do those things?" (referencing comprehensive psychoeducational evaluations, speech-language evaluation, occupational therapy evaluation, and FBA), the Director stated, "That's not a question I'm going to answer, Sir." (NT pg. 313). The Director identified the Parent's records request dated August 15, 2023, submitted on behalf of and testified that she did not know why it took Lab Charter School six months to provide any records in response to the FERPA request. (P-17; NT pg. 314).

32.  Lab Charter conducted the Student's triennial reevaluation in the fall of his 4th grade school year. On December 7, 2023, Lab Charter issued its Reevaluation Report, which was not comprehensive and failed to provide accurate data and analysis to enable the IEP team to develop appropriate programming. (P-12).

33.  In the December 7, 2023 Reevaluation Report, Lab Charter indicated that the Student's most recent IEP was dated October 18. The Student never had an IEP developed on that date and had two IEPs developed in the intervening time. (P-12, p. 2; P-4; P-9)

34.  Later, on December 7, 2023, in the Reevaluation Report, the evaluator indicated that the Student had been receiving Tier 3 Supports since the last evaluation. Tier 3 Supports are not special education services and do not include a modified curriculum. The psychologist's statement did not clarify how the Student was receiving Supplemental Learning Support and Emotional Support while spending all day in a general education setting and receiving only sporadic pull-out support. (P-12, p. 21).

35.  In Lab Charter's December 7, 2023, Reevaluation Report, the Parent expressed concern about the Student's learning style and information reception. It highlighted the Student's daily struggles in school and lack of adequate support. (P-12, pg. 2; NT pg. 536).

36.  The December 7, 2023, Reevaluation Report also included the administration of the WISC-V. Like the Student's original evaluation, the Student's scores on the WISC-V were discrepant, rendering the FSIQ (75) not accurately reflect the Student's overall cognitive functioning. (P-12, pgs. 8-11; NT pp. 408-409; NT pg. 659; NT pg. 663; See Appendix A Summary Tables of Assessments).

37.  A comparison of the Student's achievement scores in the December 7, 2023, Reevaluation Report to the 2020 Initial Evaluation Report indicated that the Student is falling further behind the regular education peers. (Compare P-3, pgs. 9-11 with P-12, pgs. 11-12; NT pgs. 406-407; NT pg. 519; NT pg. 520; NT pg. 522, l; NT pgs. 675- 676).

38.  According to the December 7, 2023 Reevaluation Report, the Student's teachers reported significant academic needs in written expression, especially spelling and grammar. Lab Charter failed to administer an objective assessment of these skills. Lab Charter did not administer an assessment such as the written expression subtests in the KTEA-3 or the Test of Written Language. (P-12, pg. 4; NT pg. 380).

39.  The December 7, 2023, Reevaluation Report included teacher input and assessments that indicated the Student had concerns in functional communication, social skills, organization, attention, use of language, and emotional regulation. (P-12).

40.  The December 7, 2023, Reevaluation Report notes that the Student is easily distracted, demonstrated significant inattention, struggled to follow directions, was easily angered, eloped, refused to complete work, and climbed on furniture. As part of the

December 7, 2023 Reevaluation, two teachers and the Student's Mother completed multiple rating scales, including the BASC-All three raters provided input indicating that the Student scored in the Clinically Significant range in the areas of Externalizing Problems, Internalizing Problems, and Behavioral Symptoms, including Hyperactivity, Aggression, Anxiety, Depression, and Adaptability. The Student's remaining composite scores were a combination of At-Risk and Clinically Significant scores. Although the score reflects numerous interfering behavioral concerns, Lab Charter did not conduct an FBA. (P-12, pgs. 2, 4-5, and 13-16; NT pgs. 413– 415).

41. The December 7, 2023, Reevaluation Report did not include a single recommendation related to the Student's identified behavioral regulation, emotional regulation, sensory processing, organization, attentional, communication, language, study skill, or social skill deficits. (P-12, pgs. 22-24).

42. The standardized academic achievement scores in Lab Charter's December 7, 2023, Reevaluation Report from the middle of the Student's fourth grade school year confirmed that the Student's scores in 12 areas were either Well Below Average or Significantly Below Average. (P-12, pgs. 11-12; NT pgs. 533).

43. The psychologist, who reviewed the BASC-3 ratings from Lab Charter's December 7, 2023, Reevaluation Report, agreed that there were an awful lot of Clinically Significant behaviors, meaning that the Student's teachers and Mother agreed that oftentimes the Student was dysregulated. (NT pg. 669, lines 1-17).

44. On January 30, 2023, Lab Charter issued the Student's new annual IEP. The January 30, 2023, IEP did not include a positive behavior plan and stated that the Student was otherwise well-behaved. At the same time, the IEP, in another section, reported that the Student was defiant, eloped, and became frustrated when given nonpreferred tasks. (P-9, pg. 7; P-10, pg. 8). Although the frequency of the interfering behaviors was trending upward, Lab Charter did not offer to conduct a functional behavioral assessment (FBA) or offer a positive behavior support plan (PBSP). (NT pgs. 208, line 6 – 209, line 3; NT pgs. 294, p.295).

45. The January 30, 2023, IEP failed to include annual goals statements that would provide the Student with meaningful educational benefits. The goals developed were either overly broad or largely unable to be measured or were inappropriate for the Student's known present levels. (P-10, pgs. 17-23).

46. The January 30, 2023,  IEP reported that even with the support of a word box and prompts for capitalization, spelling, and organization the Student required significant support to write a

simple sentence. At the same time, the IEP included a goal to write a 5-sentence paragraph independently. The goal omitted if accuracy, use of conventions, or number of sentences was a measure of mastery. (P-10, pg. 17).

47. The January 30, 2023, third-grade IEP grouped all reading skills like decoding, fluency,  and comprehension into a single goal statement monitored by monthly probes that resulted in a single percentage score measuring accuracy. This type of goal consolidation makes progress monitoring and reporting highly inaccurate. Assuming fluency was the main goal, the proper measure would include the calculation of the number of words correct per minute, not accuracy. (P-10, pg. 19).

48. Pursuant to the January 30, 2023, IEP, the Student continued to participate fully in all classes using the general education curriculum with decreasing Supplemental Learning Support and Emotional Support. (P-10, pgs. 27-29).

49. Although the January 30, 2023, IEP indicated that the Student would receive small group Learning Support, along with individual counseling sessions twice a week for 15 minutes. The IEP team increased the time in regular education from 77% to 79% of the day in general education setting. (Compare P-10, pgs. 24-29 with P-9, pgs. 21-26). The IEP carried over the identical, generic SDI that had been implemented during the repeat of 2nd grade. (P-4, pg.36; P-9, pg. 21; P-10, pg. 24).

50. Although the IEP was changed in January 2023, the progress monitoring reports dated March 24, 2023, and June 24, 2023, reported data on the Student's previous February 1, 2022 IEP. Like before, the reports relied heavily on anecdotal narratives and omitted objective data as set out in the goal statements. (P-9, pgs. 15-20). For example, in the report dated March 24, 2023, Lab Charter included a narrative statement about reading comprehension and sight word goals at the 0.8 grade level (kindergarten). All in all, the Student's records and the testimony do not explain or document the alleged improvement from 0.8 to a 2.0 level (P-9, pgs. 15 and 19; P-4, pg. 35).

51. In January 2024, the Parent's counsel continued to make efforts to obtain the Student's educational records from Lab Charter pursuant to FERPA and the IDEA. No substantive responses were given. (P-22; P-23).

52. The teacher testified that the Student's writing levels are very low and that the Student fumbles when writing. (NT pg. 244). The Student's Exact Path assessment, administered in January 2024, indicates that the Student is performing below grade level in Language Arts, Reading, and Math. (P-13, pg. 7).

53. The February 2024 IEP did not identify instructional levels in reading, written expression, and math. (P-13, pg. 7-8).

54. After receiving the March 2024 private Autism report, Lab Charter did not issue a new permission to reevaluate or revise the Student's IEP in light of this new proposed diagnosis prior to the end of the 2023-24 school year (NT pg. 64). The Lab Charter never sought to incorporate the Center for Autism report into a charter school reevaluation. (NT pgs. 300 301, line 2).

55. In August 2024, at the beginning of the Student's 5th grade school year (2024-25), Lab Charter convened an IEP meeting in response to the Student's Mother's request that the team revise the IEP light of the private diagnosis of Autism. (P-16).

56. The marking period ended at the end of October 2024, and Lab Charter did not provide progress monitoring reports or a report card to the Student's Mother until mid-December. (NT 52; NT pgs. 314-316). The record does not indicate that the Student has made meaningful progress while attending Lab Charter. (Compare P-3, pgs. 9-11 with P-12, pgs. 11-12; NT pgs. 161; P-9; P-16, pgs. 21-31).

57. The Student's Lab Charter's February 2024 and revised August 23, 2024 IEPs in place at the time of the hearing stated that the Student's behaviors impeded learning or the learning of others. (NT pg. 291, lines 11-20; P-16, pg. 1). Lab Charter's Director of Special Education testified that when the IEP behavior box is checked, Lab Charter needs to do an FBA and develop a PBSP. She further testified that she could not recall seeing an FBA or PBSP done, but checking the box should have driven the FBA and the PBSP. (NT pg. 292). A review of the record indicates that the Lab Charter did not complete an FBA or a PBSP for the Student. (NT pgs. 293).

58. On February 8, 2024, two months after issuing the Reevaluation Report and a week after the Student's annual IEP would have been due, Lab Charter issued the Student's new annual IEP. The February 8, 2024, IEP failed to address all of the Student's areas of need and did not represent an offer of FAPE to the Student. (P-13).

59. The February 8, 2024, IEP changed the Student's Level of Support from Supplement to Itinerant Learning Support with Speech and Language support, and at the same time, noted that the Student was not receiving speech and language support time. (NT pgs. 248).

60. The February 8, 2024, IEP noted that the Student has "considerable deficits" in computation, geometry, measurement, and statistics, as well as gaps and difficulty in algebra, estimation,

and real-world math problems, indicating that the Student is not making meaningful progress. (P-13, pg. 7).

61.  Using a replacement curriculum, the February 8, 2024, IEP states that the Student is functioning well below grade level in reading and math and further notes increasing behaviors of concern. (P-13, pgs. 6-11).

62.  The February 8, 2024, IEP failed to describe what programming would occur during the 13% of the day the Student would be outside the general education classroom or when during the day the service would occur. The February 8, 2024, IEP also reduced the Student's counseling services to 30 minutes each month. (P-13).

63.  The February 8, 2024, IEP did not include objective goal statements; instead, the goal statement referred to open ended descriptor of "grade level" work. (P-13, pgs. 20-25).

64.  The February 8, 2024, IEP did not include any support or accommodations for the Student's identified needs in organization, attention, emotional regulation, language, sensory processing, or behavior. (P-13).

65.  The Director of Special Education testified that a "Sure, there should have been a NOREP" with the February 8, 2024 IEP." (NT pg. 315).

66.  The Special Education Director testified that under normal circumstances involving a child diagnosed with Autism, the charter school conducts a speech and language evaluation and occupational therapy evaluation. (NT pg. 311). Between the time of the filing of the due process complaint in November 2024 and the time of the hearing on January 22, 2025, Lab Charter did not issue a Permission to Reevaluate form for an occupational therapy evaluation for the Student. (NT 315).

67.  On March 8, 2024, The Student was privately evaluated by the Center for Autism. The Center for Autism administered the Autism Diagnostic Observation Schedule, Second Edition (ADOS-2), and the Gilliam Autism Rating Scale – Third Edition (GARS-3). According to the March 8, 2024, Center for Autism Evaluation Report, the Student demonstrates inconsistent non-verbal communication, limited reciprocity in communication, mixed typical and atypical play, and a limited ability to express feelings and describe social phenomena. (P-14).

68.  The March 8, 2024, Center for Autism Evaluation Report diagnosed the Student with Autism Spectrum Disorder and noted specific concerns in social communication and restrictive/repetitive behaviors. The Center for Autism further identified target behaviors of eliminating self-injurious and aggressive behaviors

and improving regulation of emotions and social communication. (P-14, pg. 13). The March 8, 2024, Center for Autism Evaluation Report recommended, among other things, outpatient therapy, one-on-one support in school, involvement of a Behavioral Consultant in developing the Student's educational programming, and attendance at a school geared toward those with Autism. (P-14, pgs. 13-20).

69. The Parent provided Lab Charter with the March 8, 2024, Center for Autism Evaluation Report upon receipt in March (NT pgs. 299).

70. The Student's Mother ("Parent") filed a due process complaint on November 26, 2024, requesting an IEE and further alleged that Lab Charter failed to provide the Student with a free, appropriate public education and from November 26, 2022, through the date of the Hearing Officer's decision. (P-1; NT pg. 33; pg. 34).

71. The Coordinator reviewed the due process complaint filed on November 26, 2024, with her Director and was aware that the Parent asked Lab Charter to fund independent educational evaluations consisting of a comprehensive psychoeducational evaluation, speech and language evaluation, occupational therapy evaluation, and an FBA. Never issued a NOREP or filed a due process complaint to defend the Lab Charter reevaluations. (NT pg. 530). Lab Charter never offered to fund an independent psychoeducational evaluation, independent speech and language evaluation, independent occupational therapy evaluation, and independent functional behavioral assessment after it received the due process complaint dated November 26, 2024. (NT pgs. 560-561,).

72. Lab Charter issued a permission to reevaluate, dated January 21, 2025, one day prior to the first hearing date in the due process special education case. (NT pg. 561). The January 21, 2025, Permission to Reevaluate form indicated that the school would conduct a Speech and Language evaluation, an Occupational Therapy evaluation, and an FBA. (S-22).

73. On February 13, 2025, midway through the hearing, Lab Charter provided a Reevaluation Report dated February 7, 2025, to the Student's Mother via counsel and held the IEP team meeting. (NT pg. 549; NT pg. 528)

74. When asked why Lab Charter did not do standardized academic achievement testing during the February 7, 2025 reevaluation, which occurred during the timeframe of the due process hearing, the school psychologist, the psychologist testified, "I don't know. I can't say...." (NT pg. 664). The Director of Special Education testified that when she was out on leave, between November 2023 and November 2024, the Chief Executive Officer of Lab

Charter served as both CEO and Director of Special Education. (NT pg. 253, lines 1-16; NT pg. 2; NT pg. 344; NT pg. 440; NT pg. 570).

75. The psychologist did not conduct standardized academic achievement testing as part of the February 7, 2025, charter school reevaluation. (NT pg. 644, lines 5-9).

76. As part of the Student's triennial reevaluation, the Parent requested that Lab Charter evaluate the Student for IDEA eligibility as a student with Autism. The Parent and two teachers provided ratings for the Autism Spectrum Rating Scale (ASRS). The ratings completed by all raters raised numerous areas of concern, and all resulted in a Total Score for the Student in the Very Elevated range. (P-12, pgs 16-20).

77. At least one rater's responses resulted in scores placing the Student in the Very Elevated range for Social/Communication, Unusual Behavior, Self-Regulation, Peer Socialization, Adult Socialization, Atypical Language, Stereotypy, Behavioral Rigidity, Sensory Sensitivity, and Attention/Self-Regulation. (P-12, pgs. 16-18).

78. Lab Charter then concluded that the numerous elevated scores were a result of the Student's ADHD and further determined that the Student's ongoing disability category of other health impairment (OHI) would "suffice" until a medical diagnosis could be made. (P-12, pg. 22; NT pg. 423).

79. Although the staff at Lab Charter expressly recognized that the Student demonstrated characteristics like a person with Autism, Lab Charter has not yet determined their impact on the Student's ability to access educational programming. (P-12, pg. 22; NT p. 429).

80. The Student's reading and math scores on the administered portions of the KTEA-3 were in either the Significantly Below Average range (Phonological Processing, Nonsense Word Decoding, Decoding Composite, Sound Symbol Composite, Math Concepts and Applications, and Math Composite) or the Well Below Average range (Math Computation, Reading Comprehension, Letter & Word Recognition, Silent Reading Fluency, and Reading Composite). These KTEA -3 scores aligned with the Exact Path assessment scores that indicated the Student was in the 1st percentile in Mathematics and Language Arts. Lab Charter's evaluator failed to determine actual instructional levels and/or specific reading and math skills the Student could demonstrate in these areas of recognized need. (P-12, pgs. 4, 11-12; NT pgs. 410; A comprehensive table of all test scores is included in Appendix A).

81.  Lab Charter did not administer either a speech and language evaluation or an occupational therapy evaluation to determine the extent and/or nature of the Student's deficits. (P-12, pgs. 4-5, 13-20; NT pgs. 386-387 NT pg. 419).

82.  The general education teachers at Lab Charter only receive a copy of the "IEP-At-a-Glance" instead of the complete IEP. (NT pg. 239; NT pg. 298).

83.  The February IEP reduced services and changed the Student's educational placement to Itinerant Learning Support and also removed the specially designed instruction calling for the Student to receive small-group Learning Support instruction. (Compare P-13, pgs. 31-33 with P-10, pgs. 27-29).

84.  Given the Student's then-present levels, the math, work completion, and written expression goals were unattainable in one year. (P-13, pgs. 7, 20-22).

85.  Rather than identify a single skill and provide an objective measure of performance, Lab Charter endorses the use of overly broad goal statements. For example, the Student's written expression goal required improvement in the clarity of the main idea, inclusion of supporting details, use of a logical flow, and use of correct conventions/grammar as a single goal. The teacher stated that the Student "fumbles" when they write. The IEP fails to include sufficient data to write a reasonably calculated writing goal statement (P-13, pg. 22).

86.  The Student's reading goals were inadequate and insufficient. For example, one required the Student to identify main ideas, recognize supporting details, and make inferences "using teacher design comprehension passage quizzes and textbooks" with 80% accuracy. The IEP did not include a baseline or an accurate statement of the Student's present level. (P-13, pgs. 23-24). Although interfering behaviors escalated in duration and frequency, Lab Charter did not develop a positive behavior support plan (PBSP) for the Student. (NT pgs. 187-191; NT pg. 208, lines 6-20; NT pgs. 294; 295, line 8; NT pg. 425).

## The Parent Secured a Private Evaluation and the FERPA Request

87.  The March 2024 Center for Autism psychological evaluation report identified Autism as one of the Student's disabilities. Still, Lab Charter never incorporated that disability into the Student's IEP as a primary or secondary disability. (NT pg. 304; NT pg. 305).

88. Lab Charter did not issue a NOREP indicating that they had reviewed the Center for Autism psychological report, agreed with or disagreed with, or incorporated the results into the Student's IEP. (NT pg. 303).

89. The Lab Charter Director of Special Education testified that including Autism as a child's primary or secondary disability category "would not have affected the programming for this kid significantly. And this is based on the fact that ADHD and Autism are co-morbid disabilities, and they present basically the same way, almost the same way, especially with a level one Autism." (NT pgs. 306). The Director further testified that Autism and ADHD present the same way on the DSM-V. (NT pg. 307, lines 2-6). The Director next stated that Autism could be listed as a secondary disability for the Student, but Lab Charter decided not to identify the disability. (NT pg. 307).

90. The Student spent the first several months of the 5th grade school year in a general education setting with minimal pull-out academic support and no programming or interventions for identified needs in social communication, social skills, study skills, organization, attention, executive functioning, sensory processing, emotional regulation, and behaviors. (NT pgs. 80-82).

91. The Special Education Director testified that during a leave of absence from November 3, 2023, to November 11, 2024, Dr. Coleman-Hill acted as the Special Education Director. (NT p.253)

92. The Special Education Director stated she was unaware of an August 16, 2023, FERPA request until her return from medical leave in November 2024. (NT p.315)

### Credibility and Persuasiveness of the Witnesses' Testimony

In a due process hearing, the hearing officer must assess the witness's credibility, weigh the evidence and determine the persuasiveness of testimony. *J. P. v. County School Board*, 516 F.3d 254, 261 (4th Cir. 2008); *A.S. v. Office for Dispute Resolution (Quakertown Community School District),* 88 A.3d 256, 266 (Pa. Comm. 2014). Each witness provided testimony in a candid, straightforward manner. The testimony of the Lab Charter staff, while candid, was not clear or cogent. The staff, while well-meaning, could not answer basic questions or explain the lack of record keeping, progress monitoring, ESY eligibility determination process, grading, child find policy, or how they implemented the IEPs. The Mother was clear, articulate, and detailed. Therefore, I gave the testimony of the staff limited weight.

## Analysis and Conclusions of Law

## Procedural and Substantive Violations of the IDEA and Section 504

The record demonstrates, by a preponderance of the evidence, that Lab Charter committed multiple procedural and substantive violations of the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act. This pattern of violations denied the Student a FAPE and interfered with the Parent's participation in the FAPE process.

First, Lab Charter failed to locate, identify, and evaluate the Student in all areas of suspected disability, violating 34 C.F.R. § 300.304(c))(4). Despite administering otherwise reliable instruments such as the WISC-V, WIAT-III, KTEA-3, BASC-3, ASRS, ADOS-2, DIBELS, and Exact Path diagnostics, Lab Charter failed to interpret the results and connect them to instructional planning meaningfully. The WISC-V cognitive assessments showed a significant greater-than-20-point discrepancy between Verbal Comprehension (VCI = 92 in 2020, 86 in 2023) and Working Memory (WMI = 72 in 2020, 65 in 2023), along with persistent low scores in Processing Speed (PSI = 45 to 83). Despite these critical and telling data points, no executive functioning goals, scaffolding strategies, or instructional interventions were integrated into the Student's IEPs. (Appendix A Structured Summary Tables).

Although further academic testing confirmed multiple classroom-based learning needs that required specially designed instruction, Lab Charter did not respond. The WIAT-III and KTEA-3 revealed academic deficits across all reading, writing, and math domains, with standard scores frequently falling between the <1st to 7th percentile. Exact Path scores for Math (739 SS, 1st percentile) and reading (915 SS, 15th percentile) remained consistently well below benchmark expectations. The Student's DIBELS Oral Reading Fluency score (69 correct words per minute) and Maze comprehension (14.5) placed the Student at "Some Risk" according to national norms. These results provided clear evidence of persistent academic stagnation that Lab Charter ignored through repeated, recycled, and abandoned IEP goals.

Behavioral assessments using BASC-3 and Conners-3 flagged clinically significant symptoms across domains, including attention, conduct, internalizing behaviors, and executive regulation. Lab Charter failed to conduct a Functional Behavioral Assessment (FBA) or implement a Positive Behavior Support Plan (PBSP) until litigation was imminent.

The Student's ASRS and GARS-3 Autism screenings indicated "Very Elevated" Autism traits during 2023–2024. Yet, Autism eligibility was not timely considered, violating 34 C.F.R. § 300.111 and depriving the Student of needed supports, services, and specially designed instruction.

## The FERPA and IDEA Records Violation Prolonged the Dispute

Lab Charter's failure to produce the Student's educational records within 45 days violated the Parent's and the Student's rights under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and IDEA regulations, at 34 C.F.R. § 300.613. Despite requests beginning August 15, 2023, Lab Charter delayed production by over 190 days, prejudicing the Parent's ability to participate meaningfully and hindering the development of an appropriate IEP. (NT p. 314). Missing records included attendance logs, behavioral data, service logs, progress reports, testing profiles, and counseling records. The lack of full records materially contributed to the prolonged denial of FAPE. Furthermore, the shoddy record-keeping interfered with the Parent's participation and made it difficult to calculate the nature and the extent of the Student's learning loss.

## Lab Charter Failed to Respond to the Parent's Request for the IEE and Failed to Provide Prior Written Notice and Procedural Safeguards

Lab Charter violated IDEA procedural safeguards by failing to either fund an Independent Educational Evaluation (IEE) or initiate a due process hearing following the Parent's request. 34 C.F.R. § 300.502(b)(2)-(b)(3). This procedural failure mirrors the fact pattern in *Moonsammy v. Banks*, 124 LRP 35077 (S.D.N.Y. 2024), where the court found that failing to respond to an IEE request forfeits the district's ability to contest it. This procedural error further obstructed the Parent's meaningful participation and denied the IEP team, including the Parent, critical information necessary for appropriate IEP development. See also, *Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *Phillip C. v. Jefferson County Bd. of Educ.*, 701 F.3d 691, 698 (11th Cir. 2012); *Letter to Anonymous*, 56 IDELR 175 (OSEP 2011).

## The IEPs Were Fundamentally Flawed When Offered

The Evaluation Report issued by Lab Charter on December 22, 2020 (P-3) identified significant weaknesses in executive functioning, attention, processing speed, phonological processing, and written

expression. Despite these findings, the February 2021 IEP (P-4) lacked goals or SDIs addressing executive functioning or processing speed, and no support was provided for written language development. The 2023 Reevaluation Report (P-12) compounded the previous assessment mistakes. Although the evaluation data set showed a cognitive scatter that suggested invalidity of the Full-Scale IQ score, no effort was made to calculate a General Ability Index (GAI) of potential, which would have provided a more accurate representation of the Student's strengths and weaknesses. The subsequent IEPs did not address, explain, or account for this discrepancy, nor did the staff provide differentiated instruction based on the Student's unique cognitive profile. These fundamental flaws caused a cascading pattern of flawed IEPs.

The evidence further shows that the teacher and Parent concerns regarding behavior and academic success reported during IEP meetings and via anecdotal reports were not understood, integrated, or applied in such a manner as to revise the ongoing inadequate instruction, learning, and programming. Lab Charter's failure to act on the otherwise descriptive and clear evaluative data provided in the evaluation reports mirrors the circumstances in *D.S.*, where the Third Circuit concluded that the school's neglect of evaluation results and parental input led to the denial of a free appropriate public education. Simply put, Lab Charter's IEPs from 2021 to 2024 failed to incorporate critical findings from its own evaluations and staff feedback.

Lab Charter's IEPs dated February 1, 2022 (P-9) and January 30, 2023 (P-10) failed to provide a FAPE when each substantially repeated the 2021 IEP without accounting for the Student's lack of progress or learning and omitted program for recognized needs. 34 C.F.R. § 300.324(b)(1)(ii)(A) requires IEP teams to revise the IEP to address any lack of expected progress toward annual goals. In E*ndrew F. v. Douglas County School District RE-1*, 580 U.S. 386 (2017), the Supreme Court held that IEPs must be designed to enable appropriate progress in light of the child's circumstances. The repetition of stagnant, outdated, vague goals without responsive revision violates both standards. See also *Downingtown Area Sch. Dist. v. N.E.*, 772 F. App'x 86, 90 (3d Cir. 2019).

Despite clear evidence that the Student did not make meaningful academic progress during the 2021–2022 school year, the IEPs issued in February 2022 and January 2023 either reused or recycled the previous flawed goal statements. The IEP team repeated ineffective instructional approaches and lacked a data-driven decision-making and revisions process. The February 2022 and January 2023 IEPs repeated

the earlier error in using spelling test scores as a proxy data source for sight word mastery. The IEPs also failed to offer goals to address decoding, encoding, or comprehension.

Although teachers confirmed that the Student's instructional levels were below the regular education grade level/placement, Lab Charter continued to educate the Student in the regular education classroom without significant curriculum changes. Moreover, emerging behavioral concerns documented by staff—including task refusal, off-task behavior, and elopement—were left unaddressed in both IEPs. When asked, the staff did provide a cogent explanation of why Lab Charter failed to complete an FBA or PBSP or why the SDIs remained limited to generic strategies like "adult prompting" despite the Student's ongoing executive functioning and behavioral challenges. Pull-out services were inconsistently delivered, and counseling was removed without justification.

The record includes multiple examples demonstrating Lab Charter's failure to collect, revise, and analyze the progress monitoring data. Additionally, the IEP teams either lacked or omitted reporting necessary data to make informed decisions about necessary instructional strategies and interventions, which contributed to the ongoing stagnant learning curve. Lab Charter failed to revise programming to meet the Student's needs, violating both 34 C.F.R. § 300.324(b) and the standards articulated in *Endrew F.* and *Downingtown*. These omissions substantively denied the Student FAPE. Lab Charter's approach to IEP development directly conflicts with the IDEA's requirement to respond to the Student's evolving circumstances and needs. In *Endrew F.*, the Court rejected the practice of offering nearly identical IEPs and placements year after year. Lab Charter's repetition of ineffective strategies—without measurable improvements—violated that standard.

Lab Charter's IEPs from 2023 through 2024 failed to provide FAPE by not realigning goals, SDIs, and services with the findings and recommendations from its own evaluation reports and staff observations. Under 34 C.F.R. § 300.324(a)(1)(iii), the IEP team must consider the results of the most recent evaluations when developing an IEP. That did not happen here. The IEPs reflect a failure to address the Student's known needs identified in evaluations and data constitutes a procedural and substantive violation. In D.*S. v. Bayonne Board of Education*, 602 F.3d 553, 565 (3d Cir. 2010), the Third Circuit found a denial of FAPE occurs where an IEP failed to incorporate the needs-based recommendations found in evaluation reports. The Third Circuit has made clear that under the IDEA, an IEP must be reasonably

calculated to provide meaningful educational benefit and that such benefit must be measured in relation to the Student's potential.[2]

The 2023-2024 and the 2024-2025 IEPs also ignored known deficits in executive functioning, phonological processing, and written expression. These omissions violated 34 C.F.R. § 300.324(a)(1)(iii)- otherwise known as the development, review, and revision of IEP standard - and in turn denied the student FAPE under *D.S.*, *Rowley*, and *Endrew F.*

Upon finding a denial, I will discuss appropriate relief.

### Appropriate Relief Includes Retrospective and Prospective Compensatory Education along with an IEE and a 100-day Diagnostic Placement

Applying Third Circuit case law, I now conclude that the following make whole package will provide the Student with appropriate relief under the IDEA and Section 504. The totality of the record supports an award of prospective and retrospective compensatory education, an independent educational evaluation, and a 100-day diagnostic placement.

Retrospective compensatory education will remedy the denial of a FAPE from the first day of school of the 2022-2023 school year through the end of the 2023-2024 school year. Prospective compensatory education will remedy Lab Charter's failure to have an appropriate IEP in effect throughout the 2024-2025 school year.

---

[2]  Lab Charter's report card grades equal meaningful progress argument is rejected. The analysis of the Student's testing in the Appendix does directly contradicts Lab Charter's contentions. The Third Circuit has rejected the notion that passing grades alone are sufficient to demonstrate meaningful progress, particularly where a student's high cognitive potential is left unaddressed); See also *Rowley*, 458 U.S. at 203 (rejecting grades as a litmus test for FAPE). Courts have repeatedly emphasized that IDEA services must be "gauged in relation to the child's potential." *Polk*, 853 F.2d at 185; *Ridgewood*, 172 F.3d at 247. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999); *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577–78 (3d Cir. 2000); *Polk v. Cent. Susquehanna Intermediate Unit*, 853 F.2d 171, 185 (3d Cir. 1988) (IEPs must be individualized and address the full range of the child's needs—academic, behavioral, social, and emotional—consistent with their potential). *Breanne C. v. S. York Cmty. Sch. Dist.*, 732 F. Supp. 2d 474, 483 (M.D. Pa. 2010) (citing *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 394 (3d Cir. 1996)). T *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 567 (3d Cir. 2010); *West Chester Area Sch. Dist. v. Bruce C.*, 194 F. Supp. 2d 417, 421 (E.D. Pa. 2002).

To ensure the Student has an equally effective opportunity to receive a FAPE, prospective compensatory education will continue until Lab Charter reviews the IEE and the diagnostic placement data and issues a new IEP and NOREP.

Case law provides that compensatory education "accrue[s] from the point that the school district knew or should have known of the injury to the child. The child is entitled to compensatory education for a period equal to the period of deprivation but for exclusions of time reasonably required for the school district to rectify the problem. *G.L.* at 618-619 (quoting *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 396-97 (3d Cir. 1996) (citations omitted).

### The Calculation of the Retrospective Compensatory Education Relief

Third Circuit case law endorses several different legal theories explaining how to calculate the award of compensatory education relief. A fact-finder may adopt the *M.C.* "cookie cutter" approach and award a block of hours. Based on the totality of the record, the fact-finder may bifurcate the dispute and employ the *Reid* "qualitative" method endorsed in *G.L.* Finally, after canvassing the record in its entirety and making equitable adjustments, the fact-finder can fashion an equitable make-whole remedy. [3] Regardless of the approach, the filing deadline – i.e., the statute of limitations- is not a cap on the amount of relief due, and equity requires that the LEA is provided with a reasonable rectification to correct the procedural or substantive violations. When the testimony and the exhibits are bundled together, I now conclude that they create preponderant evidence and inferences that now allow me to craft a child-specific make-whole hour-for-hour award of compensatory education and other necessary relief that is both equitable and fair.

*M.C.* and *Ridgewood* hold that compensatory education is triggered when the district knew or should have known of its failure to provide a FAPE. *M.C.* and *Ridgewood* further hold that the compensatory education accrual period calculation is limited by what the court called the "reasonable rectification period." This hearing officer views the "reasonable rectification period" not as a fixed or formulaic duration

---

[3] IEPs are forward looking—designed to "conform [] to . . . [a] standard that looks to the child's present abilities"—compensatory education ion the other hand is meant to "make up for prior deficiencies." *Reid*, 401 F.3d at 522-23. IEPs "carries no guarantee of undoing damage done by prior violations" and cannot substitute for the make whole role of compensatory education. See *Wilson v. District of Columbia,* 770 F.Supp.2d 270, 276 (D.D.C.2011) (citing *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005).

but rather a fact-specific interval that directs the hearing officer to determine how much time a school district should be afforded to rectify the denial of a FAPE once the LEA either knew or should have known of the denial of a FAPE. The reasonable rectification period ensures that schools are not haphazardly penalized, and students are not overcompensated for the LEA's procedural and substantive violations. Essentially, the rectification period provides the LEA with a last chance to remediate its errors.[4]

Building on *M.C.* and *Ridgewood,* the court in *G.L.* announced that a student's right to seek compensatory education for all FAPE harms once discovered is not limited by the IDEA's two-year statute of limitations. *G.L.* 802 F.3d 601, 625 (3d Cir. 2015). Instead, the court determined that the appropriate relief must address the entire period in which a child was denied FAPE. *G.L.* stands for the proposition that while certain claims may be time-barred, appropriate relief and remedies must make the student "whole." Therefore, the *G.L.* "no cap" appropriate relief holding means that the scope, value, or quantum of the relief granted can exceed the number of school years at issue.

This hearing officer views the rectification period as an affirmative defense that can either be asserted or waived by the LEA.[5] Since Lab Charter did not assert the reasonable rectification period, I now conclude that but for days the Student was absent due to illness, there will be no further reasonable rectification reductions.

I next conclude, and the record is clear, that Lab Charter either knew or should have known of the denial of a FAPE on the first day of school of the 2022-2023 school year. Accordingly, the Student is awarded hour-for-hour, day-for-day compensatory education for each day that

---

[4]. In *Ridgewood Board of Education v. N.E.*, the court held that compensatory education is accrues where a school district "knew or should have known" that it was failing to provide FAPE and failed to act within a reasonable time. 172 F.3d 238, 250 (3d Cir. 1999).

[5] The party asserting the affirmative defense of statute of limitations or the moving party will be assigned the burden of proof. *Schaffer v. Weast* , 44 IDELR 150 (U.S. 2005)(traditional rule favors the moving party bears the burden of proof); *Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Securitization Transactions, Inc.,* 730 F.3d 263, 271, 2013 U.S. App. LEXIS 19166, 2013 WL 5184064 (3rd Cir. 2013) (because a statute of limitations is an affirmative defense, the burden of establishing its applicability to a particular claim rests with the defendant); *See also, J.L. v Ambridge Area*, 50 IDELR 219 (W.D. Pa. 2008)(statute of limitations is an affirmative defense in an IDEA action).

Lab Charter denied a FAPE, and the school was in session for the 2022-2023, 2023-2024, and 2024-2025 school years.

Caveat: The Parent's Complaint limited the scope of relief by counting back two years from the filing of the Complaint. The Complaint seeks compensatory education from November 2022 to the date of the decision. This prayer for relief, relying on the IDEA's two-year filing deadline under values the scope of the loss and the harm caused by the procedural and substantive errors. Tying the scope of the relief to the filing date, minus two years, was rejected in *G.L.*; therefore, I now conclude that Lab Charter must provide hour-for-hour and day-for-day compensatory education for the entire 2022-2023, 2023-2024, and the 2024-2025 school year.

It would be an absurd result to calculate the remedy as beginning in November of 2022 when knew or should have known date occurred in September 2022. This record is preponderant that Lab Charter failed to have an IEP in effect, as required, in September of each school year. Accordingly, applying the *G.L.* no cap holding, I now conclude that appropriate relief should begin on the first day of the 2022 school year and continue through the last day of the 2024-2025 school year, as the LEA failed to have an appropriate IEP in place each school year.

Within five school days of this Order, Lab Charter must provide the Parent with a copy of the Student's school attendance records and the school calendar for the 2022-2023, 2023-2024, and 2024-2025 school years. Once provided, the Parent is directed to reduce the total number of compensatory education school days by the number of school absences due to illness. Once the total number of compensatory education school days is established, the Student is awarded 6.5 hours a day for each day the Lab Charter was in session for each school year referenced above.

Guided by the maxim that compensatory education relief is intended to place the child in the position they would have occupied but for the violation, I further find that the relief order herein remedies the Student's overlapping and intertwined Section 504 evaluation, identification, education, and FAPE claims are also resolved. See, *G.L.*;

*Boose v. District of Columbia*, 786 F.3d 1054, 2015 U.S. App. LEXIS 8599 (D.C. Cir. 2015). This initial award does not end the analysis.

## Appropriate Relief Includes Compensatory Education For Lost ESY Services

The Parent seeks compensatory education for missed ESY services during the 2023 and 2024 summer months. As a person with Autism, pursuant to Pennsylvania standards, each February Lab Charter should have determined if the Student was eligible for ESY services, held an IEP conference to review the determination, and issues a NOREP in March, which did not here. Instead, while the IEP team checked the ESY eligibility box, Lab Charter never collected ESY data, never offered or scheduled ESY services, and never offered the Parent an ESY NOREP. The offered IEPs lack targeted appropriate behavioral goals, accommodators, SDIs, or interventions that would have enabled the Student to learn. (*K.K. v. Alta Loma Sch. Dist.*, 64 IDELR 72 (C.D. Cal. 2014). Individually and collectively, these violations interfered with the Parent's participation and the Student's FAPE rights.


Therefore, the Student is awarded 6.5 hours per day for each day Lab Charter offered ESY services to others during the 2023 and 2024 summer ESY sessions. Lab Charter is further directed to provide the Parent with the 2023 and 2024 ESY calendar; once provided, the Parent should calculate the total number of ESY compensatory education days and hours lost. The 2023 and 2024 ESY hours should be added to the above total compensatory education hours.

Next, at the close of the record, in February 2025, Lab Charter had not issued an ESY IEP or ESY NOREP for the summer of 2025 ESY session; therefore, the Parent has 10 calendar days to locate and identify a 2025 ESY replacement program, once identified Lab Charter is directed to fund the program and transport the Student to and from the program.

In the event the Parent cannot locate a substitute ESY program, Lab Charter is directed to provide the family with the 2025 ESY calendar, and the Parent is directed to calculate the missed 2025 hours and add those hours to the total retrospective compensatory education calculation.

## Transportation Cost to and From the Compensatory Education Provider

The Parent is free to choose the Student's compensatory education provider. Furthermore, since the Lab Charter IEP requires it to provide

transportation as a related service, Lab Charter must reimburse the Parent for any transportation costs incurred in transporting the Student to and from any compensatory education provider(s). The reimbursement for out-of-pocket costs for this related service is in addition to the compensatory education hours awarded to the Student. Absent this Parent-specific relief, the Student's education would not be free, and the violations of the Parent's procedural safeguard would go with a remedy.

### Use of Compensatory Education Hours and Recording Keeping

The compensatory education bank of hours calculated herein may be used for developmental, corrective, remedial, or specially designed instruction, including related services, transition services, and supplemental aids, as defined under IDEA or Section 504. On January 15 each year, until the Student reaches age 23, the Lab Charter must report the unused compensatory education hours to the Student and Parent. The Parent has sole discretion in selecting the service compensatory education services provider. Lab Charter must reimburse each provider(s) at their standard rates as they appear in each invoice. Related services costs for transportation to and from the provider must also be reimbursed at either the Lab Charter or the Internal Revenue Service's rate of travel reimbursement.

Compensatory education hours not used before the Student turns age 23 shall revert back to Lab Charter. All invoices should be paid in full within 30 days of receipt.

### Prospective Compensatory Education Accrues Until Lab Charter Offers a FAPE

As described above, Lab Charter's failure to have an IEP in effect at the outset of the 2024–2025 school year constitutes a denial of FAPE. Additionally, the reevaluation data available at that time of the offer was insufficient under 34 C.F.R. § 300.304–305 to guide individualized instruction or ensure appropriate educational planning. To cure these twin procedural and substantive violations, I find that compensatory education shall continue to accrue until the Student completes a 100-day diagnostic placement and Lab Charter offers a new IEP and NOREP. As described below, I further conclude that the Student requires a diagnostic placement.

A diagnostic placement is fundamentally an evaluative setting, not a finalized educational program or placement; therefore, the Student's attendance at the 100-day diagnostic setting does not interrupt the

ongoing prospective accrual of compensatory education. While the Student may receive some instructional exposure during this period, the core purpose of the diagnostic placement is to observe, assess, and gather data to inform future programming decisions—not to deliver agreed on specially designed instruction pursuant to a compliant IEP. A diagnostic placement lacks the essential legal characteristics of a FAPE-compliant educational program under 20 U.S.C. § 1401(9), *Endrew* or *Rowley*; therefore, compensatory education must accrue.

The prospective extension of the make-whole remedy ensures that Lab Charter is not permitted to use the evaluative function of the diagnostic placement as a shield against its continuing legal obligation to deliver FAPE. Instead, this prospective compensatory education award and 100-day diagnostic placement reflect the balancing of the equities necessary to address both past, present, and ongoing FAPE violations in real time, with appropriate urgency and legal accountability.

## Appropriate Relief Next Includes an IEE

The documentary record and testimonial evidence establish that the Student was not appropriately or properly evaluated in all areas of suspected disability. A school district cannot simply ignore a parent's request for an independent educational evaluation ("IEE"); it must either agree to fund the IEE or file a due process complaint to defend its evaluation. See, e.g., *Regional Sch. Unit #61*, 111 LRP 48320 (SEA ME 04/27/11) (holding that it is impermissible for a district to take no action following a parent's request for an IEE); *Jefferson County Schs.*, 117 LRP 12099 (SEA WV 10/28/16) (finding that a district that failed to respond to an IEE request was responsible for paying the evaluator's $4,000 fee). A district may not satisfy its obligation by proposing to conduct a reevaluation instead of addressing the Parent's IEE request. See *Fullerton Sch. Dist.*, 58 IDELR 177 (SEA CA 2012).

The flawed assessment, testing, and evaluation errors, coupled with the failure to file a complaint or grant the IEE request here, now require the Student to receive an independent educational evaluation at the public's expense.

The usual and appropriate remedy when a reevaluation fails to meet the procedural and substantive requirements of the IDEA is a hearing officer publicly funded IEE. See 34 C.F.R. § 300.502(b)(1); 34 C.F.R. § 300.502(d) (authorizing hearing officers to order an IEE as part of a due process resolution).

IEEs not only confirm the Student's ongoing IDEA eligibility but also provide the IEP team with an objective and comprehensive analysis of the Student's present levels of performance, unique needs, circumstances, and necessary related services. The IEE will serve a critical function in restoring the Parent's right to meaningful participation in the IEP development and placement process. *Schaffer v. Weast,* 546 U.S. 49, 61 (2005) (noting that an IEE affords parents "a realistic opportunity to access the necessary evidence" regarding their child's educational program).

Accordingly, the IEE shall be conducted by a qualified evaluator of the Parent's choosing. It shall include comprehensive assessments in all areas of suspected disability, including but not limited to cognition, academic achievement, executive functioning, pragmatic language, social-emotional functioning, occupational therapy, and behavior. Lab Charter shall bear full financial responsibility for the IEE, including costs related to evaluator fees, travel, test administration, observations, report writing, and any required consultation with the necessary staff and the Parent. Once the LEA fails to file a complaint to defend its evaluation, the Parent is entitled to an IEE as a matter of law.

The independent evaluator shall participate in all meetings convened to review the IEE results and the data obtained during the 100-day diagnostic placement. The IEE evaluator shall assist the Lab Charter team, including the Parent, in developing an appropriate, individualized educational program for the Student. The IEE evaluator's role shall conclude upon the issuance of a new IEP and corresponding Notice of Recommended Educational Placement (NOREP) by Lab Charter.

**Lab Charter Must Fund a 100 Day Diagnostic Placement**

Consistent with legal authority, diagnostic evaluations must occur in a classroom setting where the Student receives direct instruction alongside contemporaneous functional, academic, language, emotional, social, and behavioral assessments across all suspected areas of need. The IDEA explicitly authorizes the collection of additional evaluative data through diagnostic assessments, as codified in 34 C.F.R. §§ 300.301–300.305. Hearing officers are empowered to order such evaluations where necessary to determine eligibility or to design an appropriate IEP. *East Windsor Bd. of Educ.*, 114 LRP 36178 (SEA CT 05/15/14), *Middletown Bd. of Educ.*, 10 ECLPR 77 (SEA CT 2013), *In re: Student with a Disability*, 115 LRP 32147 (SEA NM 05/21/15), (hearing office may order a diagnostic placement as appropriate relief) See, *Appendix A* to the IDEA-Part B regulations, Question 14 (1999 regulations).

Administrative decisions consistently affirm that a diagnostic placement is permissible when the following conditions are met: 1. The placement is temporary; 2. It is not used to predetermine a final educational placement; and 3. It is solely intended to gather evaluative data to inform the development of an appropriate IEP. I now conclude that the following Order satisfies all of these conditional prongs.

To ensure the 100-day diagnostic evaluation and placement meets all applicable requirements, the Parties are directed to cooperate and complete the following tasks in a timely fashion:

1. **Parent Selection of Placement**: The Parent shall have ten (10) school days from the date of this Order to select an appropriate diagnostic placement provider.

2. **Transportation Arrangements**: Within five (5) school days of the Parent's selection, Lab Charter shall secure transportation for the Student to and from the diagnostic placement. If Lab Charter fails to arrange transportation within this timeframe, the Parent is authorized to arrange private transportation, with Lab Charter fully responsible for all related service costs.

3. **Timeline for Commencement**: The diagnostic placement must begin no later than the sixteenth (16th) school day following the date of this Order.

4. **Funding Responsibilities**: Lab Charter shall bear all costs, fees, charges, and expenses associated with the diagnostic

placement, transportation to and from the diagnostic placement, and the independent educational evaluation (IEE).

5. **Comprehensive Independent Educational Evaluation and Diagnostic Evaluation**:

   a. During the first sixty (60) school days of the placement, the independent evaluator selected by the Parent, in cooperation with the diagnostic setting's staff and Lab Charter, shall complete a comprehensive ability, academic, behavioral, social, emotional, and executive functioning evaluation of the Student in all areas of suspected disability. The staff at the diagnostic placement should complete all necessary curriculum-based assessments to identify the Student's strengths, weaknesses, and needs in all areas that affect participation in the regular education curriculum.

   b. If necessary, the evaluator may also conduct or direct another evaluator to complete further assessments/testing, including a Functional Behavioral Assessment (FBA) addressing in-school and in-home circumstances, as well as assessments related to school-based behaviors that interfere with learning and emotional regulation. All testing shall be completed within the same sixty (60) school-day timeframe. The IEE evaluator shall prepare a report within 20 school days, and the Parties, including the IEE evaluator and the staff at the diagnostic placement, should meet to review the existing data. Once reviewed, Lab Charter should offer a new IEP and a NOREP.

## Conclusion

The remedies set forth in this Order are designed to bring the Lab Charter into full compliance with its obligations under the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act. These measures are not only legally necessary but also equitable as they are crafted to return the Student to the educational trajectory they would have followed had Lab Charter not committed the procedural and substantive violations documented in this decision.

The combination of relief awarded—comprising retrospective compensatory education, prospective compensatory education, an independent educational evaluation (IEE), and a 100-day diagnostic evaluation and placement—is essential to fully redress the denial of

FAPE under both IDEA and Section 504. These remedies are intended to correct past harm and ensure appropriate educational planning going forward. The scope of the IDEA relief resolves the Student's intertwined Section 504 FAPE claims asserted by the Parent, which overlap factually and legally with the IDEA violations. The award of prospective compensatory education shall cease on the date the new, legally compliant IEP and NOREP are issued.

This Decision and Order provide a comprehensive remedy that ensures the Student's educational rights are fully vindicated and that all legal violations are corrected in a timely, meaningful, and forward-looking manner.

## ORDER

**NOW**, this 30th day of April 2025, it is hereby ORDERED that the Parent's claims under the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act are GRANTED. The Parties are directed to collaborate in good faith and to comply with all deadlines and directives set forth herein.

### A. Retrospective Compensatory Education Award

1. **Award Period**: Lab Charter shall provide compensatory education for all school days from the first instructional day of the 2022–2023 school year through the end of the 2023–2024 school year, excluding days the Student was absent due to illness.
2. **Calculation Method**: For each school day the school was in session during the awarded period, the Student shall receive 6.5 hours of compensatory education.
3. **ESY Compensation**: The Student is awarded 6.5 hours per day for each ESY day that Lab Charter offered to other students in summer 2023, 2024, and 2025. Lab Charter must provide ESY calendars for each year within 5 school days of the Order. If the Parent does not locate a 2025 ESY program within 10 calendar days of the Order, the additional hours shall be calculated and added to the retrospective relief.
4. **Attendance Records**: Within five (5) school days of this Order, Lab Charter must provide the Parent with official school calendars and attendance records for 2022–2025. The Parent shall subtract absences due to illness from the total school days.
5. **Use of Hours**: Compensatory education hours may be used for any developmental, corrective, remedial, or specially designed instruction, including related services and transition services as

defined under IDEA or Section 504. The Parent is free to select the provider.

6. **Expiration**: Compensatory education hours may be used until the Student reaches age 23, after which unused hours shall revert back to Lab Charter.

7. **Service Provider Discretion and Reimbursement**: The Parent may choose the provider(s). Lab Charter shall reimburse all services at standard rates and transportation costs within 30 days of invoice. Mileage shall be reimbursed at the IRS standard mileage rate.

## B. Prospective Compensatory Education

8. **Continued Accrual**: Compensatory education shall accrue from the first day of the 2024–2025 school year and continue until:
   - The Student completes a 100-day diagnostic placement, **AND**
   - Lab Charter issues a new IEP and NOREP based on the diagnostic placement and IEE.

9. **Instructional Nature**: Instruction provided during the diagnostic placement shall not count as a FAPE; therefore, education hours in the diagnostic place are part of the Student's prospective compensatory relief and shall continue to accrue concurrently until the Lab Charter offers a new IEP and NOREP.

## C. Independent Educational Evaluation (IEE)

10. **IEE Authorization**: Lab Charter shall fund an Independent Educational Evaluation at public expense in accordance with 34 C.F.R. § 300.502.

11. **Scope**: The IEE shall include assessments of ability, academic achievement, executive functioning, language, behavior, and social-emotional development.

12. **Evaluator Selection**: The Parent shall select the IEE evaluator. The evaluator shall participate in all IEP team meetings until the issuance of a new IEP and NOREP.

13. **Costs Covered**: Lab Charter shall cover all related fees, testing, observation, and consultation costs.

## D. Diagnostic Placement

14. **Duration**: Lab Charter shall fund a 100-day diagnostic placement to occur in a classroom setting with direct instruction

and concurrent evaluative activities in all areas of suspected disability.

15. **Timeline and Process**:

- **Provider Selection**: The Parent shall select the diagnostic provider within 10 school days.
- **Transportation**: Lab Charter shall arrange transportation within 5 school days of provider selection. If it fails to do so, the Parent may make private arrangements, which the Lab Charter must pay for.
- **Commencement**: The placement shall begin no later than the 16th school day after the date of this Order.

16. **The Evaluation During and Report After the Placement**:

- The IEE evaluator and diagnostic placement staff shall complete all assessments within 60 school days.
- A final written report shall be issued no later than 20 school days following the 60th day of the diagnostic placement.
- A team meeting shall be convened within 10 school days of the report's issuance to review the data and draft a new IEP and NOREP.

17. **Funding**: Lab Charter shall bear all costs of the placement, transportation, evaluations, and related services necessary to effectuate this Order.

## III. MISCELLANEOUS

18. **Annual Reporting**: On or before January 15 of each year until the Student turns 23, Lab Charter shall provide a written accounting to the Parent of all unused compensatory education hours.
19. **Finality of Order**: The remedies ordered herein are final and binding, subject to any appeal rights provided under applicable federal or state law

**SO ORDERED this 30th day of April 2025**

*s/s Charles W. Jelley, E*sq. LL.M
Special Education Hearing Officer
ODR FILE #30546-24-24 KE

# Appendix A
# Standardized Test Score Summary & Structured Tables

**WISC-V (2020)**

| Index / Subtest | Standard Score | Percentile | Descriptor |
|---|---|---|---|
| Verbal Comprehension Index | 92 | 30th | Average |
| Visual Spatial Index | 86 | 18th | Low Average |
| Fluid Reasoning Index | 76 | 5th | Low |
| Working Memory Index | 72 | 3rd | Low |
| Processing Speed Index | 45 | <1st | Very Low |
| Full-Scale IQ | 73 | 4th | Low |
| Vocabulary | 9 | 37th | Average |
| Similarities | 8 | 25th | Low Average |
| Block Design | 7 | 15th | Low Average |
| Visual Puzzles | 8 | 25th | Average |
| Matrix Reasoning | 7 | 16th | Low Average |
| Figure Weights | 5 | 5th | Low |
| Digit Span | 5 | 5th | Low |
| Picture Span | 5 | 5th | Low |
| Coding | 1 | <1st | Very Low |
| Symbol Search | 0 | <1st | Very Low |

**WIAT-III (2020)**

| Subtest / Composite | Standard Score | Percentile | Descriptor |
|---|---|---|---|
| Basic Reading | 67 | 2nd | Very Low |
| Word Reading | 66 | 1st | Very Low |
| Reading Comprehension | 73 | 4th | Low |
| Pseudoword Decoding | 67 | 2nd | Very Low |

| Oral Reading Fluency | 70 | 2nd | Very Low |
|---|---|---|---|
| Spelling | 61 | <1st | Very Low |
| Written Expression | 60 | <1st | Very Low |
| Numerical Operations | 66 | 1st | Very Low |
| Math Problem Solving | 63 | 1st | Very Low |

**BASC-3 (2020)**

| Scale / Composite | T-Score | Rater | Interpretation |
|---|---|---|---|
| Hyperactivity | 85 | Teacher | Clinically Significant |
| Aggression | 80 | Teacher | Clinically Significant |
| Conduct Problems | 72 | Teacher | Clinically Significant |
| Attention Problems | 79 | Teacher | Clinically Significant |
| Adaptability | 30 | Teacher | Clinically Significant |
| Social Skills | 28 | Teacher | Clinically Significant |
| Functional Communication | 40 | Teacher | At Risk |
| Anxiety | 72 | Teacher | Clinically Significant |
| Depression | 65 | Teacher | At Risk |
| Withdrawal | 70 | Teacher | Clinically Significant |
| Learning Problems | 80 | Teacher | Clinically Significant |
| Social Skills | 32 | Parent | Clinically Significant |
| Functional Communication | 38 | Parent | At Risk |

# Comparative Analysis of P-2, P-3, and P-14 Evaluation Data

### Test Score Comparison Table

| Domain | Subtest | P-3 (2020) | P-14 (2023) | Change | Interpretation |
|---|---|---|---|---|---|
| Cognitive – WISC-V | VCI (Verbal Comprehension) | SS=92 (30%) | SS=86 (~18%) | -6 pts | Mild decline; still a relative strength. |
| Cognitive – WISC-V | WMI (Working Memory) | SS=72 (3%) | SS=65 (1%) | -7 pts | Significant weakness persisted and worsened. |
| Cognitive – WISC-V | PSI (Processing Speed) | SS=45 (<1%) | SS=83 (~13%) | +38 pts | Major jump; behavior/test compliance suspected. |
| Academic – WIAT-III | Word Reading | SS=66 (1%) | - | n/a | Low decoding with no follow-up measurement. |
| Academic – WIAT-III | Written Expression | SS=60 (<1%) | - | n/a | Severe writing weakness is unaddressed. |
| Academic – KTEA-3 | Letter & Word Recognition | - | SS=77 (6%) | n/a | Below-average decoding skills are unchanged. |
| Academic – KTEA-3 | Reading Comp. | - | SS=78 (7%) | n/a | Low comprehension; matches fluency data. |
| Academic – KTEA-3 | Math Concepts | - | SS=66 (1%) | n/a | Persistent math reasoning difficulties. |
| Behavioral – BASC-3 | Hyperactivity | T=85 | T>70 | Stable | Behavioral regulation remained impaired. |
| Reading Fluency | DIBELS ORF | - | 69 cwpm | n/a | Fluency significantly |

| | | | (Yellow Risk) | | below benchmark. |
|---|---|---|---|---|---|
| Reading Comp. | DIBELS Maze | - | 14.5 correct (Yellow Risk) | n/a | Reading comprehension is below grade level. |

# Student-Specific FAPE Impact Analysis

| Domain | Evidence Present? | Commentary |
|---|---|---|
| Cognitive Testing (WISC-V) | ✅ Yes | Completed in P-3 (2020) and P-14 (2023) |
| Academic Achievement (WIAT-III, KTEA-3) | ✅ Yes | WIAT-III in P-3; KTEA-3 in P-14 |
| Speech-Language Evaluation | ✖ No | No comprehensive receptive, expressive, or pragmatic language evaluation was found. |
| Occupational Therapy (OT) | ✖ No | No fine motor or sensory profile was conducted |
| Functional Behavior Assessment (FBA) | ✖ No | Behavior was tracked, but no formal FBA was conducted |
| Executive Function Measures | ✖ No | WMI scores were noted, but no BRIEF or EF-specific tools were administered |
| Social-Pragmatic Measures | ✖ No | No test data assessing peer interaction or social reciprocity |
| Autism-Specific Diagnostic Follow-up | Partial | ASRS and GARS were used, but ADOS was delayed until outside referral |

| IEP Progress Monitoring | ✅ Yes | Rubrics and probes are not present, and mastery and frequency are unclear |
| Service Delivery Logs | Partial | Not all SDI minutes matched delivery; fidelity was inconsistent |

# Comparative Analysis of P-2, P-3, and P-14 Evaluation Data

### Test Score Comparison Table

| Domain | Subtest | P-3 (2020) | P-14 (2023) | Change | Interpretation |
|---|---|---|---|---|---|
| Cognitive – WISC-V | VCI (Verbal Comprehension) | SS=92 (30%) | SS=86 (~18%) | -6 pts | Mild decline; still a relative strength. |
| Cognitive – WISC-V | WMI (Working Memory) | SS=72 (3%) | SS=65 (1%) | -7 pts | Significant weakness persisted and worsened. |
| Cognitive – WISC-V | PSI (Processing Speed) | SS=45 (<1%) | SS=83 (~13%) | +38 pts | Major jump; behavior/test compliance suspected. |
| Academic – WIAT-III | Word Reading | SS=66 (1%) | - | n/a | Low decoding with no follow-up measurement. |
| Academic – WIAT-III | Written Expression | SS=60 (<1%) | - | n/a | Severe writing weakness is unaddressed. |
| Academic – KTEA-3 | Letter & Word Recognition | - | SS=77 (6%) | n/a | Below-average decoding skills are unchanged. |
| Academic – KTEA-3 | Reading Comp. | - | SS=78 (7%) | n/a | Low comprehension; |

| | | | | | matches fluency data. |
|---|---|---|---|---|---|
| Academic – KTEA-3 | Math Concepts | - | SS=66 (1%) | n/a | Persistent math reasoning difficulties. |
| Behavioral – BASC-3 | Hyperactivity | T=85 | T>70 | Stable | Behavioral regulation remained impaired. |
| Reading Fluency | DIBELS ORF | - | 69 cwpm (Yellow Risk) | n/a | Fluency significantly below benchmark. |
| Reading Comp. | DIBELS Maze | - | 14.5 correct (Yellow Risk) | n/a | Reading comprehension is below grade level. |

## Score Tables by Assessment Instrument

### WISC-V (2020)

| Subtest/Area | Score/Description |
|---|---|
| Verbal Comprehension Index (VCI) | 92 |
| Visual Spatial Index (VSI) | 86 |
| Fluid Reasoning Index (FRI) | 76 |
| Working Memory Index (WMI) | 72 |
| Processing Speed Index (PSI) | 45 |

### WISC-V (2023)

| Subtest/Area | Score/Description |
|---|---|
| Full-Scale IQ | 75 (not valid) |
| Verbal Comprehension Index (VCI) | 86 |
| Visual Spatial Index (VSI) | 84 |
| Fluid Reasoning Index (FRI) | 79 |
| Working Memory Index (WMI) | 65 |
| Processing Speed Index (PSI) | 83 |

### WIAT-III (2020)

| Subtest/Area | Score/Description |
|---|---|
| Word Reading | 66 |

| Pseudoword Decoding | 67 |
| Oral Reading Fluency | 70 |
| Spelling | 61 |
| Written Expression | 60 |
| Numerical Operations | 66 |
| Math Problem Solving | 63 |

### KTEA-3 (2023)

| Subtest/Area | Score/Description |
| --- | --- |
| Sound Symbol Composite | 60 |
| Decoding Composite | 69 |
| Letter & Word Recognition | 77 |
| Reading Comprehension | 78 |
| Silent Reading Fluency | 71 |
| Math Concepts & Applications | 66 |
| Math Computation | 73 |

### Exact Path Diagnostic (Fall 2023)

| Subtest/Area | Score/Description |
| --- | --- |
| Language Arts | 708 (1st percentile) |
| Reading | 864 (9th percentile) |
| Math | 740 (1st percentile) |

### Exact Path Diagnostic (Winter 2024)

| Subtest/Area | Score/Description |
| --- | --- |
| Language Arts | 857 (14th percentile) |
| Reading | 915 (15th percentile) |
| Math | 739 (1st percentile) |

### DIBELS (Spring 2023)

| Subtest/Area | Score/Description |
| --- | --- |
| Oral Reading Fluency | 69 cwpm |
| Maze Comprehension | 14.5 correct (Yellow Risk) |

### ASRS (2023)

| Subtest/Area | Score/Description |
| --- | --- |
| Total Score and all domains | Very Elevated |
| DSM-V Subscale | Elevated |

### Conners-3 (2020)

| Subtest/Area | Score/Description |
| --- | --- |

| Teacher | Very Elevated – Peer Relations, Executive Function, Learning Problems |
|---|---|
| Parent | Elevated – Inattention |

### BASC-3 (2020)

| Subtest/Area | Score/Description |
|---|---|
| Clinically significant | Hyperactivity, Aggression, Anxiety, Depression, Withdrawal |

### BASC-3 (2023)

| Subtest/Area | Score/Description |
|---|---|
| Clinically significant | Externalizing, Internalizing, Behavior Symptoms Index, Adaptability |

### ADOS-2 (2024)

| Subtest/Area | Score/Description |
|---|---|
| General Observation | Observed social and communication impairments (qualitative only) |

### GARS-3 (2024)

| Subtest/Area | Score/Description |
|---|---|
| Autism Index | 115 – Very Likely ASD |